UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - :

ELI SAMUEL MADERA,                    :        15 Civ. 3127 (WHP) (JCF)
                                      :
              Plaintiff,              :          REPORT AND
                                      :        RECOMMENDATION
    - against -                       :
                                      :
COMMISSIONER OF SOCIAL SECURITY,      :
                                      :
              Defendant.              :
- - - - - - - - - - - - - - - - - :                               5/9/16

TO THE HONORABLE WILLIAM H. PAULEY, U.S.D.J.:

     Plaintiff Eli Samuel Madera, proceeding pro se, brings this

action pursuant to section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking review of a determination of

the Commissioner of Social Security (the "Commissioner") that he is

not entitled to Supplemental Security Income ("SSI") or disability

insurance benefits.  The Commissioner has submitted a motion for

judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons that follow, I recommend

denying the Commissioner's motion, vacating her decision denying

benefits, and remanding the case.

Background

    A.  Personal and Vocational History

    Mr. Madera was born on December 9, 1963, and claims a

disability onset date of November 1, 2007, as a result of

hypertension, hyperlipidemia, hepatitis A, B, and C, diabetes,

mental problems, depression, arthritis, and migraine headache.  (R.

at 298, 301, 366).[1]  He does not speak English fluently.  (R. at 365).  Mr. Madera attained a high school graduate equivalency diploma, but he has not completed any specialized job training or graduated from a trade or vocational school.  (R. at 367).  Prior to his claimed disability onset date, he was employed as a carpenter, a construction worker, a cook in a fast food restaurant, a plumber, and a supermarket worker.  (R. at 367).

     B.   Medical History

        1.   Physical Impairments

On September 8, 2010, Mr. Madera visited Nedjie Pierre, a doctor of podiatric medicine, complaining of ankle pain that intensified in cold weather.  (R. at 408).  Dr. Pierre noted an abnormal gait and a "painful, hypertrophic bony prominence on the medial distal aspect to the foot."  (R. at 408).  The plaintiff experienced pain upon ankle dorsiflexion, subtalar joint inversion, and subtalar joint eversion.  (R. at 408).  Dr. Pierre assessed arthritis and prescribed ankle supports and "extra-depth orthopedic shoes and custom orthotics."  (R. at 408).

The following week, having been "referred from another clinic," the plaintiff sought treatment from podiatrist Robert Rampino for foot pain when ambulating or wearing shoes.  (R. at

_____

[1] Citations to "R." refer to the Administrative Record that the Commissioner filed with the Court as part of her answer to the complaint.

702).   Dr. Rampino diagnosed painful bone growth in the first metatarsal cuneiform joint of the left foot, and prescribed Clinoril, a non-steroidal anti-inflammatory drug ("NSAID").   (R. at 703).   An x-ray of Mr. Madera's left foot on September 15, 2010, revealed "spurring of the first tarsometatarsal joints consistent with degenerative disease," but was otherwise normal.   (R. at 699).

The plaintiff saw Dr. Pierre again on October 21, 2010, complaining of pain in his right ankle.   (R. at 405).   Dr. Pierre again noted an abnormal gait, as well as limited range of motion in the subtalar joint of Mr. Madera's right ankle, pain in the right ankle upon palpation, subtalar joint inversion, and subtalar joint eversion.   (R. at 405).   She assessed arthritis and prescribed the NSAID naproxen.   (R. at 405).

Mr. Madera saw various podiatrists in connection with his left foot pain in September and October 2010.   (R. at 704-07, 709-11). Dr. Rampino surgically removed the bone growth on November 24, 2010.   (R. at 693-94).   One week later, the plaintiff reported that his pain had "markedly improved."   (R. at 731).   Follow-up appointments indicated no complications.   (R. at 734, 736).

The plaintiff saw Dr. Pierre on April 14, 2011, in connection with pain in his right ankle.   (R. at 395).   Her assessment was similar to that of October 21, 2010, except she also noted pain upon ankle dorsiflexion and plantarflexion.   (R. at 395).

3

Mr. Madera saw Dr. Valeria Loukanova-Ivanov on May 23, 2011, for a refill of his blood pressure medications. (R. at 549). She assessed hypertension and type II diabetes, continued his medications for those conditions, and prescribed a sleeping pill for insomnia. (R. at 549-50).

On October 11, 2011, Dr. William Lathan performed a consultative internal medicine examination. (R. at 454). Dr. Lathan noted Mr. Madera's history of substance abuse -- including heroin abuse and consequent dependence on Suboxone, which is used to treat opioid addiction -- diabetes, hypertension, hepatitis B and C, and obesity. (R. at 454). Mr. Madera could perform all activities of personal care and daily living. (R. at 454). He had a "waddling gait" and could not walk on heels and toes or squat fully. (R. at 455). He used a cane for both balance and support. (R. at 455). The examination was otherwise unremarkable. (R. at 455-56). Dr. Lathan assessed moderate restrictions in squatting, standing, walking, and strenuous exertion. (R. at 457).

On December 9, 2011, Dr. Dale Dudley, an internist whom Mr. Madera had visited in the past (R. at 385-86, 388, 390-91, 393, 397-99, 400), completed a Medical Source Statement of Ability to Do Work Related Activities (Physical). (R. at 561-64). According to Dr. Dudley, the plaintiff could occasionally lift and carry ten pounds and frequently lift and carry less weight. (R. at 561). He could walk less than two hours and sit less than six hours in an

eight-hour workday.  (R. at 561-62).  Pushing and pulling were limited in his lower extremities.  (R. at 562). He could never climb, balance, kneel, crouch, crawl, or stoop.  (R. at 562).  He could occasionally perform gross and fine manipulation.  (R. at 563).  Mr. Madera had significant environmental limitations, including sensitivities to noise, dust, extreme temperature, humidity, fumes, and chemicals.  (R. at 564).

Dr. Dudley filled out a second Medical Source Statement on December 27, 2011.  (R. at 640-45).  Mr. Madera's lifting and carrying limitations were unchanged.  (R. at 640).  However, Dr. Dudley opined that the plaintiff could sit for only three hours in an eight-hour workday, stand for only one hour, and walk for only 30 minutes.  (R. at 641).  In addition, he could sit for one hour at a time, stand for 30 minutes at a time, and walk for 10 minutes at a time, and he required a cane to ambulate.  (R. at 641).  He could reach and perform fine manipulation occasionally with his right hand, but never perform gross manipulation or push and pull. (R. at 641).  With his left, he could frequently reach, occasionally perform fine manipulation, but never push and pull. (R. at 642).  He had no limitations in feeling with either hand. (R. at 642).  Climbing ladders or scaffolds, kneeling, crouching, and crawling were impossible, but Mr. Madera could occasionally climb stairs and ramps, balance, and stoop.  (R. at 643).  The plaintiff could not be exposed to unprotected heights or moving

5

mechanical parts, but could tolerate moderate office noise and occasionally tolerate humidity, pulmonary irritants, extreme heat or cold, and vibrations. (R. at 644). He could operate a motor vehicle. (R. at 644). His physical impairments did not limit non-work activities of daily living, such as shopping, travelling without a companion, preparing food, and caring for personal hygiene. (R. at 645).

On February 3, 2012, Mr. Madera visited Dr. Dudley with multiple complaints, including constipation, recurrent scrotal warts, and red eyes. (R. at 796). Dr. Dudley assessed opioid dependence, conjunctivitis, wart, constipation, and type II diabetes, and noted a mildly distended GI tract. (R. at 796). He refilled Mr. Madera's Suboxone prescription, prescribed ophthalmic medication and medication for constipation, provided a referral to a dermatologist, and ordered a series of laboratory tests. (R. at 796-97). Mr. Madera returned for a follow-up on February 23, requesting a refill of his blood pressure medication and complaining that he had pulled a muscle in his ribs while playing a video game. (R. at 792). Dr. Dudley assessed opioid dependence and conjunctivitis. (R. at 790). On March 2, the plaintiff returned for a Suboxone refill. (R. at 790).

On March 15, 2012, Mr. Madera saw Dr. Pierre for diabetic foot care. (R. at 786). He complained of pain on the top of his left foot when walking. (R. at 786). Dr. Pierre noted brittle,

discolored, elongated nails that were painful upon palpation. (R. at 786). Mr. Madera's orthopedic examination was normal with the exception of pain on the top of his left foot upon palpation and pain in the midtarsal joint of his left foot. (R. at 786). Dr. Pierre assessed pain in limb, a fungal nail infection, and arthritis. (R. at 786).

##### 2.   Mental Impairments

On July 12, 2010, Mr. Madera visited Leonardo Vando, M.D., pursuant to a referral for treatment of anxiety and depression. (R. at 506). Dr. Vando noted the plaintiff's long history of psychiatric issues, which had previously been treated with the antipsychotic Seroquel and the antidepressant Lexapro, which had significant side effects. (R. at 506). Upon examination, Dr. Vando assessed a constricted and blunted affect, and fair attention, insight, judgment, abstraction, and impulse control. (R. at 506). The examination was otherwise unremarkable. (R. at 506). Dr. Vando diagnosed opioid dependence and anxiety. (R. at 506). In a follow-up appointment one week later, Mr. Madera reported continued "extreme anxiety and depression" on days following Interferon injections.[2] (R. at 504). In contrast to the

---

[2] Interferon is used to treat hepatitis and can cause or aggravate depression, anxiety, and other mental impairments. Interferons for Chronic Hepatitis B, www.webmd.com/hepatitis/interferons-for-chronic-hepatits-b (last visited May 6, 2016).

prior week, Mr. Madera displayed a normal, appropriate affect.  (R. at 504).  Dr. Vando prescribed Lexapro and Klonopin, which can be used to treat panic disorders.  (R. at 504).

Mr. Madera saw Richard Cedeno[3] on July 30, 2010, for a refill of Ambien.  (R. at 601).  His psychiatric assessment upon examination was congruent with Dr. Vando's assessment of July 19.

On August 2, 2010, the plaintiff sought refills of medications, which he had taken every day in contravention of his treatment contract with Dr. Vando.  (R. at 676).  Dr. Vando diagnosed opioid dependence, anxiety, and hepatitis C without hepatic coma, and referred Mr. Madera to addiction treatment.  (R. at 676).  On October 16, 2010, Mr. Madera sought a Suboxone refill from Dr. Joseph Harris, who noted that the plaintiff denied illicit drug use or increased stressors or cravings.  (R. at 406).

On April 7, 2011, Mr. Madera visited Dr. Romeeda Mohammed complaining of depression, insomnia, and increased anxiety following his father's death.  (R. at 396).  He had a constricted affect and exhibited a depressed, sad, tearful mood.  (R. at 396).  Dr. Mohammed continued Mr. Madera's Klonopin prescription, discontinued Lexapro, and prescribed Ambien and the antidepressant Remeron.  (R. at 396).

---

[3] There is some discrepancy in the record as to whether Richard Cedeno is a medical doctor or a physician's assistant.  (R. at 666-69, 678).

On June 8, 2011, at an appointment for medication management, Dr. Arcangelo Lubrano noted that Mr. Madera appeared stable, and continued the prescriptions for Remeron, Ambien, and Klonopin, in addition to increasing the plaintiff's dosage of Zoloft. (R. at 671). At a July 6, 2011 follow-up, Dr. Lubrano stopped the Remeron prescription, but continued Ambien, Klonopin, and Zoloft, noting again that the plaintiff appeared stable. (R. at 670).

Dr. Dmitri Bougakov, a psychologist, performed a consultative psychiatric examination on October 11, 2011. (R. at 450-53). The plaintiff reported insomnia, poor appetite, dysphoric mood, loss of interest, low energy, difficulty concentrating, a diminished sense of pleasure, forgetfulness, and "nightmares of a diabolic nature." (R. at 450). Dr. Bougakov found Mr. Madera appropriately dressed and groomed, with normal posture and motor behavior, appropriate eye contact, and a slight limp. (R. at 451). The plaintiff's expressive and receptive language skills were adequate and his thought process was coherent and directed. (R. at 451). His affect was "of full range," his mood neutral and sensorium clear, and he was oriented to person, place, and time. (R. at 451). His attention and concentration were within normal limits. (R. at 451). Dr. Bougakov assessed Mr. Madera's memory skills as mildly impaired, and his intellectual functioning at below average with a somewhat limited fund of information. (R. at 451-52). Insight and judgment were fair. (R. at 452). Mr. Madera could perform non-

9

work daily activities, such as dressing and bathing himself, managing money, and taking public transportation. (R. at 452). Dr. Bougakov found that Mr. Madera could follow simple directions, perform simple tasks, maintain attention and concentration, and maintain a regular schedule. (R. at 452). He was somewhat limited in his ability to learn new tasks and perform complex tasks, but more limited in his ability to make appropriate decisions, relate well with others, and deal with stress. (R. at 452). Dr. Bougakov opined that the plaintiff's psychiatric problems were not significant enough to interfere with his ability to function on a daily basis. (R. at 452). He diagnosed depressive disorder with some psychotic features; heroin and cocaine abuse in remission; diabetes; hypertension; hepatitis A, B, and C; syphilis; and arthritis. (R. at 452-53). Mr. Madera's prognosis was fair. (R. at 453).

Psychologist E. Kamin performed a Psychiatric Review Technique on November 2, 2011, assessing Mr. Madera with a depressive disorder and heroin and cocaine abuse in remission (R. at 518, 521, 526). The plaintiff was mildly limited in the activities of daily living and maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace. (R. at 528). The Mental Residual Functional Capacity Assessment performed on the same day found moderate limitations in the following areas: ability to understand, remember, and carry out detailed instructions;

10

ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual; ability to complete a normal work day and work week without interruption from psychologically-based symptoms; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others. (R. at 532-33). He had no significant limitations in any other areas. (R. at 532-33). The evaluator found that Mr. Madera had the ability to perform semi-skilled work. (R. at 534).

Richard Cedeno examined Mr. Madera on December 13, 2011, and found him in good general health with no weight loss or gain, weakness, fatigue, or fever. (R. at 668). He was able to perform his usual activities. (R. at 668). His psychological examination was unremarkable. (R. at 668). The treatment notes indicate Mr. Madera's Klonopin, Ambien, and Zoloft prescription were continued, but his Lexapro prescription was stopped. (R. at 669). Treatment notes from January 10, 2012, are similar. (R. at 666).

Dr. Lubrano examined Mr. Madera and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on January 11, 2012. (R. at 647-49, 665). He assessed the plaintiff with moderate limitations in his ability to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, and interact appropriately with the public and

11

co-workers.  (R. at 647-48).  There were marked limitations in his ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors, and respond appropriately to usual work-related situations and changes in a routine work setting.  (R. at 647-48).  Dr. Lubrano renewed Mr. Madera's medications on February 8, 2012, and March 7, 2012, both times noting that the plaintiff was stable with no reported side effects. (R. at 662-64).  In a subsequent report dated April 17, 2012, Dr. Lubrano noted the plaintiff's symptoms as poor sleep, crying spells, and anxiety, and diagnosed him with depressive disorder, as well as diabetes, hepatitis B, and substance abuse.  (R. at 683). He opined that the plaintiff's symptoms would last for at least twelve months, and noted that his treatment -- with Remeron, Ambien, Klonopin, Zoloft, and Suboxone -- caused drowsiness, which limited his activities.  (R. at 684).  Dr. Lubrano assessed the plaintiff with marked limitations in activities of daily living, marked to extreme difficulties in maintaining social functioning, marked deficiencies in concentration, persistence, and pace, and moderate limitations due to potential episodes of deterioration or decompensation in a work-like setting.  (R. at 685-86).

On May 16, 2012, Dr. Thomas O'Brien noted that Mr. Madera's depression was stable, and that he was taking Klonopin, Zoloft, and Ambien.  (R. at 822).  On May 25, 2012, Dr. Dudley refilled the

plaintiff's Suboxone prescription and noted that he was "otherwise well." (R. at 823). Each month between July 2012 and January 2013 Mr. Madera saw either Dr. Lubrano or Dr. Carl Saint-Preux[4] for medication management. (R. at 843, 853, 868, 873, 878, 883, 888). Each time, he was assessed as stable, oriented, and cooperative without evidence of delusions, hallucinations or suicidal ideation. (R. at 843, 853, 868, 873, 878, 883, 888).

On July 18, 2012, Dr. Lubrano filled out another Mental Residual Functional Capacity Assessment. (R. at 688-90). Mr. Madera was moderately or markedly limited in all areas. (R. at 688-89). He had moderate limitations in the following abilities: remembering locations and work-like procedures; carrying out very short and simple instructions; making simple work-related decisions; interacting appropriately with the public; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; and travelling in unfamiliar places or using public transportation. (R. at 688-89). He had marked limitations in the following abilities: understanding and remembering short and simple

---

[4] Dr. Saint-Preux's last name is spelled, variously, "Saint-Preux" (R. at 873), "Saint Preux" (R. at 913), and "St. Preaux" (R. at 920).

instructions; understanding, remembering, and carrying out detailed instructions; maintaining attention or concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining a routine without special supervision; working in coordination with or proximity to others without distraction; completing a work day and work week without interruption from psychological symptoms and performing at a consistent pace; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers; and setting realistic goals or making plans independently of others. (R. at 688-89).

The plaintiff visited Dr. Saint-Preux on February 7, 2013, complaining of depression manifested by symptoms of insomnia, fatigue, hallucinations and paranoia, and depressed mood. (R. at 781). Dr. Saint-Preux diagnosed major depressive disorder, diabetes, and hypertension, and assigned a GAF score of 70.[5] (R. at 781).

_____

[5] The GAF is a psychiatric assessment tool that generates a numerical representation of a clinician's judgment as to a patient's overall functioning along a continuum of mental health. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-5"). The GAF was dropped from DSM-5 "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Id. The GAF Scale provides scores from 1 ("[p]ersistent danger of severely hurting self or others") to 100 ("[s]uperior functioning in a wide range of activities"). American Psychiatric Association, Diagnostic and Statistical Manual of

Dr. David Mahony, a psychologist, performed a consultative examination on February 19, 2013. (R. at 772). Mr. Madera reported insomnia, loss of appetite, depressed mood, loss of interest, feelings of hopelessness and worthlessness, difficulties concentrating, and social withdrawal. (R. at 772). He had cognitive deficits because of his limited education, and deficits in short-term memory, executive functioning, and learning new material. (R. at 772-73). The plaintiff reported that he could dress, bathe, and groom himself, although his sister did all the household chores. (R. at 774). Mr. Madera's appearance and eye contact were appropriate, and he walked with a cane. (R. at 773). His speech was mumbled but generally audible, and his expressive and receptive languages were adequate. (R. at 773). He appeared confused and "needed many questions repeated several times before he gave relevant answers. He would just begin mumbling inaudible things." (R. at 773). His mood was dysphoric, his affect was dysthymic, and his sensorium was mildly impaired. (R. at 773). His recent and remote memory skills were impaired and his cognitive functioning was below average. (R. at 774). Dr. Mahony opined that, although Mr. Madera could understand and follow simple

---

Mental Disorders 34 (4th ed. text revision 2000) ("DSM-IV"). A GAF score between 60 and 70 indicates "[s]ome mild symptoms . . . [or] some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, [with] some meaningful interpersonal relationships." DSM-IV at 34.

directions and perform simple tasks, he would have "severe difficulty maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks, making appropriate decisions, relating to others, and dealing with stress." (R. at 774). He diagnosed severe major depressive disorder without psychotic features, cognitive disorder, and polysubstance dependence in remission. (R. at 775). Mr. Madera's prognosis was poor, and he could not manage his own funds. (R. at 775). Dr. Mahony's Medical Source Statement of Ability to Do Work-Related Activities (Mental) reflected these findings. The plaintiff had mild limitations in his ability to understand, remember, and carry out simple instructions and moderate limitations in ability to make judgments on simple work-related decisions. (R. at 776). His limitations as to more complex instructions or decisions were marked or extreme, and his limitations in interacting with co-workers or supervisors were marked. (R. at 776-77). Dr. Mahony found that these limitations were due to a low I.Q., and that "all [of Mr. Madera's] functioning [was] impaired." (R. at 776-77).

Dr. Saint-Preux saw Mr. Madera for medication management during the months of April and May 2013. (R. at 919-24). He filled out a Physician's Report for Claim of Disability Due to Mental Impairment on June 10, 2013. (R. at 908-13). He noted that Mr. Madera's mood was depressed and anxious, although he was

16

coherent, not suicidal, and without hallucinations.  (R. at 908).
Dr. Saint-Preux diagnosed the plaintiff with major depressive
disorder, panic disorder, hypertension, diabetes, blood pressure
issues, and assigned a GAF score of 70.  (R. at 909).  Mr. Madera's
prognosis was poor and he had marked restrictions in performing
activities of daily living, and maintaining social functioning,
concentration, persistence, and pace; episodes of deterioration or
decompensation would limit him markedly in the workplace.  (R. at
910-12).  Dr. Saint-Preux's Mental Residual Functional Capacity
Assessment, completed the same day, indicated that Mr. Madera was
markedly limited in all areas of understanding and memory,
sustained concentration and persistence, social interaction, and
adaptation.  (R. at 914-15).

    C.  <u>Procedural History</u>

    Mr. Madera filed an application for disability insurance
benefits on August 5, 2011 (R. at 176) and an application for SSI
on August 26, 2011 (R. at 177), alleging that his mental and
physical impairments disabled him as of November 1, 2007 (R. at
366).  His applications were initially denied on November 7, 2011
(R. at 178), and he thereafter sought a hearing before an
Administrative Law Judge ("ALJ") (R. at 184-85).

    A hearing took place on September 21, 2012, before ALJ Seth I.
Grossman.  (R. at 51).  Mr. Madera was accompanied by a non-
attorney representative and testified through a translator (R. at

53).  Mr. Madera testified that after he permanently resettled in
New York from Puerto Rico in 1990, when he was twenty-eight years
old (R. at 55), he worked in landscaping, construction, and as a
migrant farm worker (R. at 56-57).  He stopped working in 2007
after he had two accidents, one in which he was hit by a car.  (R.
at 58-59).  The plaintiff asserted that both his ankles were
"broken," and that he suffered from hepatitis and two clogged veins
near his heart.  (R. at 58).  His left foot was operated on in
2010.  (R. at 60).  He used a cane mostly because of his left
ankle, although both ankles hurt.  (R. at 84).  Asked whether he
had friends, Mr. Madera responded that he did not have "real
friends" but that he got along with his sister (with whom he lived)
and spoke with his mother weekly.  (R. at 64-65).  Interactions
with strangers were difficult because when someone disagreed with
his, he got upset and "los[t] his mind."  (R. at 64-65).  Mr.
Madera asserted that he received treatment for depression which
helped "a bit."  (R. at 68).  His psychological problems kept him
from working.  (R. at 68).  He described his mental state as
"plugged and confused," although his explanation was "a little
incoherent," according to the translator.  (R. at 79).  He watched
television most of the day.  (R. at 77).  Mr. Madera stated that he
could walk three or four blocks before requiring rest, could not go
down stairs, could sit for fifteen to twenty minutes before having

18

to get up, and could travel by bus or subway, although negotiating the steps made his progress slow. (R. at 77-78).

Another hearing, also before ALJ Grossman, was held on July 15, 2013, with Mr. Madera counseled by the same non-attorney representative and again testifying through an interpreter.[6] (R. at 89-91). Mr. Madera testified that he began using a cane in approximately 2008, after an accident, and that he used a brace to support his ankle. (R. at 111-13). As to other physical ailments, he testified that he had hepatitis A, B, C, and D; diabetes; high cholesterol and blood pressure; and that he weighed 260 pounds. (R. at 113-14). He also testified that he had depression and that the medication he took made him tired. (R. at 115, 120-21). Dr. Gerald Galst, a cardiologist and internist, testified as a medical expert that, based on his "liver chemistries," Mr. Madera might have hepatitis C, but that there was no documentation of ongoing liver disease. (R. at 125-26). He also stated that, although Mr.

---

[6] It is unclear from the record why a second hearing was held. Although the Commissioner asserts that Mr. Madera "requested and received two hearings" (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Memo.") at 1), the record does not reflect that Mr. Madera requested a hearing after September 21, 2012 -- the date of the first hearing -- and there is only one letter from the Social Security Administration acknowledging a request for a hearing (R. at 192-93). While there are two hearing notices in the record, the second is an "Amended Notice of Hearing" that merely states that a hearing was "rescheduled" for July 15, 2013 "because [the ALJ] learned that [he] cannot hold the hearing at the time and place set." (R. at 260).

19

Madera was obese, his blood pressure readings were generally normal or only slightly elevated, and that there was "not demonstrable cardiac disase." (R. at 126-27).  Dr. Galst noted treatment for diabetes, but no "documented complications."  (R. at 127). Although there were documented problems with the plaintiff's ankle and foot, there was "no clear-cut reason for him to use a cane." (R. at 127, 130).  According to Dr. Galst, Mr. Madera's physical impairments would not prohibit him from performing light work.  (R. at 131). Yaakov Taitz,[7] a vocational expert, also testified.  He asserted that Mr. Madera's past relevant work, which included carpenter, construction worker, cook, and plumber (R. at 151-52), were largely skilled, medium work (R. at 153, 164-65), and that the plaintiff had no transferrable skills to less than medium exertion jobs (R. at 165).[8]

_____

[7] The transcript of the hearing reflects this name as "Jacob Tight."  (R. at 89, 136).  However, ALJ Grossman's decision indicates that his name is Yaakov Taitz.  (R. at 16).

[8] The transcript of this hearing is somewhat disquieting.  For example, in response to a question posed by ALJ Grossman, Mr. Madera's representative instructs Mr. Madera to answer only the question asked and offer no more information.  (R. at 93-94).  The ALJ objects and there is an exchange of words between the ALJ and the representative which culminates in ALJ Grossman stating, "[C]ounselor, you can give him any advice that you want but if I tell him to say what he wants to say you -- he will answer it that way or he will be denied benefits."  (R. at 94).  There follows a colloquy among the ALJ, the representative, and Mr. Madera (through a translator) apparently geared toward determining whether Mr. Madera can understand English, although it "degenerate[es]" -- that is ALJ Grossman's word (R. at 98) -- into an argument between the representative and the ALJ concerning whether Mr. Madera handwrote

The ALJ issued his opinion denying benefits on November 14, 2013.  (R. at 10-32).  Mr. Madera requested review by the Appeals Council (R. at 9), which denied his request on February 27, 2015 (R. at 1-8).

Analytical Framework

    A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if he can demonstrate, through medical evidence, that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

---

some English text on a document.  This squabble goes on for pages, with the representative bickering and the ALJ badgering.  (R. at 97-110).    The model of Social Security hearings is to be "investigatory, or inquisitorial, rather than adversarial."  Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) (quoting Seavey v. Barnhart, 276 F.3d 1, 8 (1st Cir. 2001)).  Here, neither the ALJ nor Mr. Madera's representative comported himself appropriately.

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  First, the claimant must demonstrate that he is not currently engaging in substantial gainful activity.   20 C.F.R. §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b).  Second, the claimant must prove that he has a severe impairment that "significantly limits his physical or mental ability to do basic work activities."   20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  Third, if the impairment is included in what is known as "the Listings" -- 20 C.F.R. Part 404, Subpt. P, App. 1 -- or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.   20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).  Fourth, if the claimant is unable to make the requisite showing under step three, he must prove that she does not have the residual functional capacity ("RFC") to perform his past work.   20 C.F.R. §§ 404.1520(a)(4)(iv), (e), 416.920(a)(4)(iv), (e).  Fifth, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.   20 C.F.R. §§ 404.1520(a)(4)(v), (g), 404.1560(c),

416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

   B. Judicial Review

   Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

   The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence."  Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014)

23

(quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), and Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

    A.  The ALJ's Decision

ALJ Grossman engaged in the five-step analysis required by the regulations.  At step one, he found that Mr. Madera had not engaged in substantial gainful activity since the alleged disability onset date.  (R. at 18).  At step two, he found that the plaintiff had the following severe impairments: type II diabetes without complications, hepatitis C, history of bunion surgery, history of right ankle fracture, and obesity.  (R. at 18).  ALJ specifically found that Mr. Madera's depression was not severe.  (R. at 18).

At step three, the ALJ found that the plaintiff's impairments did not meet or medically equal the severity of one of the impairments identified in the Listings, either alone or in combination.  (R. at 19).  He examined the following Listings: 1.02 (major dysfunction of a joint); 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones); 5.05 (chronic liver disease); 9.00B5 (diabetes mellitus and other pancreatic gland disorders); 12.04 (affective disorders); and 12.06 (anxiety-related disorders).  (R. at 19-23).

Under listing 9.00, impairments due to endocrine disorders are evaluated under the listings for the other body systems affected. 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 9.00B. ALJ Grossman found that Mr. Madera had not "exhibited any symptoms or suffered from any complications resulting from [] diabetes mellitus," so

25

that he could not meet this listing.  (R. at 19).  The issues in
the plaintiff's lower extremity -- his right ankle and left foot --
similarly did not meet the relevant listings.  The ALJ found that
to meet either listing 1.02 or listing 1.06, "the claimant must be
unable to ambulate effectively, including needing at least two
canes or a walker." (R. at 19).  Because there was no evidence in
the record of Mr. Madera requiring these aids or being similarly
burdened, he did not meet these listings.  (R. at 19-20).  Listing
5.05 requires that the claimant's liver disease have caused certain
other effects, such as "hemorrhaging, ascit[es], hydrothorax,
spontaneous  bacterial  peritonitis,  hepatorenal  syndrome,
hepatopulmonary syndrome, hepatic encephalopathy, [or] end-stage
liver disease."  (R. at 20); 20 C.F.R. Part 404, Subpt. P, App. 1,
Listing 5.05A-G.  ALJ Grossman noted that lab testing from July 24,
2012, "revealed that the claimant's blood levels were within normal
limits for markers of liver damage" and were "not confirmatory of
any significant or disabling ongoing liver damage."  (R. at 20).

Similarly, ALJ Grossman found that the plaintiff's mental
impairments did not meet the criteria found in listing 12.04 or
listing 12.06.  (R. at 20-22).  That is, he did not have at least
two of the following: marked restrictions of activities of daily
living; marked difficulties in maintaining social functioning;
marked difficulties in maintaining concentration, persistence, or
pace; or repeated episodes of decompensation, each of extended

26

duration.   (R. at 20).   He first concluded that, based on Dr.
Mahony's February 19, 2013 report and Dr. Lathan's October 11, 2011
report, Mr. Madera had only mild restrictions in activities of
daily living.   (R. at 20).   ALJ Grossman similarly determined that
the plaintiff had mild difficulties in social functioning based on
evidence that he interacted with others through shopping and doctor
visits; the fact that he got along with his doctors and with the
ALJ himself at the hearing; the plaintiff's report that his
treatment had been somewhat helpful; and evidence that he continued
to seek treatment.   (R. at 21).   Looking to medical records as well
as the plaintiff's comportment at the hearing, the ALJ found mild
difficulties with concentration, persistence, or pace, noting that
"later, more severe findings of the doctors tasked to assess the
claimant's mental health for purposes of disability run somewhat
contrary to the claimant's contemporaneous report that psychiatric
treatment had had a positive effect on his mental health condition,
and call some of the more severe findings . . . into question."
(R. at 21-22).   ALJ Grossman rejected Dr. Mahony's findings because
they were based on inaccurate information -- specifically that Mr.
Madera had only a fifth grade education and had worked only in
housekeeping, whereas he actually had a high school education and
had worked various skilled jobs.   (R. at 22).   In addition, there
was no evidence of episodes of decompensation of extended duration.
 (R. at 22).   Finally, ALJ Grossman found no evidence "of such

marginal adjustment that even a minimal increase on mental demands or change in environment would be predicted to cause the individual to decompensate" or of a history of inability to function outside a highly supportive living environment. 20 C.F.R. Part 404, Subpt. P, App. 1, Listings 12.04C(2), (3), 12.06C(2), (3); (R. at 22).

At step four, the ALJ found that Mr. Madera had the residual functional capacity to perform light work and had "no mental limitations in a job setting." (R. at 23). ALJ Grossman noted at the outset of his analysis that the treatment notes did not generally indicate that Mr. Madera had mental impairments that would restrict him at work. (R. at 23). He admitted to "some recent mention of depression and paranoia" -- although he appeared to discount the mention of paranoia because it post-dated the first hearing on Mr. Madera's claim -- but stated that those were contradicted by two assessments of a GAF of 70, as well as the fact that, in the past, Mr. Madera performed skilled work. (R. at 23). ALJ Grossman assigned "some weight" to consulting examiner Dr. Bougakov, insofar as he concluded that Mr. Madera's "problems would not interfere with [his] ability to function on a daily basis," but rejected Dr. Bougakov's assessment of limitations as contrary to the weight of the evidence. (R. at 23-24). He assigned "great weight" to Dr. Kamin's opinion that Mr. Madera could perform "detailed, semi-skilled work, with no relevant limitations in

social interaction," which, he noted, was "essentially identical" to his own opinion.  (R. at 24).

ALJ Grossman discounted all of Mr. Madera's treating psychiatrist's opinions, including Dr. Saint-Preux's June 10, 2013 opinion noting marked limitations in all areas and Dr. Lubrano's similar opinions of January 11, 2012, April 17, 2012, and July 18, 2012.  (R. at 24).  The ALJ gave these little weight because "they are not supported by the numerous within normal limits mental status examination in the treating notes, and because they are contradicted by the GAF of 70."  (R. at 24).  The ALJ "reiterate[d] that the findings of Dr. Saint[-]Preux, and in particular the GAF scores he repeatedly assigned to the claimant, are not consistent with the severe limitations both he and Dr. Lubrano opined the claimant to have."  (R. at 25).  He credited instead opinions of non-psychiatrists, such as Dr. Loukanove-Ivanov, who found mild impairments.  (R. at 25).  The ALJ recognized that such findings are ordinarily not accorded more weight than a treating specialists opinion, but found that "the notable absence of significant psychiatric findings outside of the claimant's mental health specialist evaluations is another factor" that supported his decision.  (R. at 25).

As to physical limitations, he accorded little weight to Dr. Latham's opinion that Mr. Madera would have moderate restrictions in squatting, standing, walking, and strenuous exertion, finding

29

that the opinion is "too vague" to be accorded significant
probative value. (R. at 25). He similarly discounted the opinions
of Dr. Dudley, finding no support for the extreme limitations the
physician noted. (R. at 25-26). Instead, he assigned "great
weight" to the opinion of Dr. Galst, who, he noted, was board
certified in internal medicine and cardiology, was familiar with
the Social Security Administration's program rules, and had the
advantage of reviewing the entire record. (R. at 26).

ALJ Grossman agreed with the vocational expert, however, that
with a residual functional capacity allowing light work, Mr. Madera
could not perform any of his past relevant work. (R. at 26-27).

The ALJ then found that Mr. Madera could not communicate in
English and that transferability of job skills was not material to
the disability determination. (R. at 27). He ruled that,
considering the plaintiff's age, education, work experience, and
residual functional capacity, Mr. Madera could perform unskilled,
light work, and a finding of "not disabled" was therefore
appropriate. (R. at 27-28).

B.   <u>Treating Physician's Rule</u>

Regulations promulgated pursuant to the Act establish that
"the opinion of a claimant's treating physician as to the nature
and severity of the impairment is given 'controlling weight' so
long as it 'is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2));[9] see also Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010). "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927(c)(2)); see also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting Mongeur, 722 F.2d at 1039 n.2)).

In considering a treating source's opinion, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (quoting McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2d Cir. 1983)); see

---

[9] In 2012, the regulations were amended and paragraphs (d) through (f) were redesignated as paragraphs (c) through (e). See

also Wagner v. Secretary of Health and Human Services, 906 F.2d 856, 862 (2d Cir. 1990) (noting that "a circumstantial critique by non-physicians . . . must be overwhelmingly compelling in order to overcome a medical opinion"). However, determination of "dispositive" issues, such as whether the plaintiff "meet[s] the statutory definition of disability" and cannot work, are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence and explanation provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c); see Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  Although the ALJ need not explicitly discuss the factors, the decision must clearly demonstrate that he properly applied the required analysis.  Khan

---

How We Collect and Consider Evidence of Disability, 77 Fed. Reg.

v. Astrue, No. 11 CV 5118, 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013) (citing Petrie, 412 F. App'x at 406).

"A corollary to the treating physician rule is the so-called 'good reasons rule,' which is based on the regulations specifying that 'the Commissioner "will always give good reasons"' for the weight given to a treating source opinion." Silva v. Colvin, No. 6:14-cv-6329, 2015 WL 5306005, at *5 (W.D.N.Y. Sept. 10, 2015) (quoting Halloran, 362 F.3d at 32); see also Burgess, 537 F.3d at 129-30 (noting that ALJ must provide "good reasons" for discounting treating physician's opinion).  Failure to identify good reasons for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." Silva, 2015 WL 5306005, at *5 (emphasis omitted) (quoting Blakely v. Commissioner of Social Security, 581 F.3d 399, 407 (6th Cir. 2007)).

### 1.  Dr. Saint-Preux and Dr. Lubrano

ALJ Grossman discounted the opinions of treating psychiatrists Dr. Saint-Preux and Dr. Lubrano that Mr. Madera had marked limitations in a number of "relevant domains," asserting that "they are not supported by [] numerous within normal limits mental status examinations in the treating notes, and because they are

---

10651-01 at 10656 (Feb. 23, 2012).

contradicted by the GAF of 70." (R. at 24). There are a number of problems with this analysis.[10]

First, it is not clear that ALJ Grossman considered the required factors in discounting the treating physicians' opinions. To be sure, he asserts that the opinions are not consistent with the record as a whole, but that is only one of the factors to be reviewed. See 20 C.F.R. 20 C.F.R. §§ 404.1527(c), 416.927(c). The scant discussion does not demonstrate that the ALJ engaged in the proper analysis. See Khan, 2013 WL 3938242, at *15. For example, there is no review of Mr. Madera's treatment relationship with these specialists. Moreover, ALJ Grossman's opinion does not appear to have considered certain other relevant facts, such as that the bulk of notations of "within normal limits mental status" seem to have been made after visits for the mere purpose of refilling prescriptions. (R. at 843, 853, 868, 873, 878, 883, 888). Nor is there an indication that he contemplated the possibility that Mr. Madera's mental functioning deteriorated over

---

[10] Although ALJ Grossman explicitly determined at step two that Mr. Madera's depression was "not severe" (R. at 18), he nevertheless addressed the condition in subsequent steps. Therefore, his failure to identify Mr. Madera's depression as "severe," even if error, would not in itself warrant remand. See Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) ("Because [the excluded condition] w[as] considered during the subsequent steps, any error was harmless."); Eralte v. Colvin, No. 14 Civ. 1745, 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014).

time -- indeed, the ALJ's reliance on Mr. Madera's past performance of skilled work (R. at 23) suggests the contrary.

Rather, it is evident that the ALJ relied heavily on the GAF scored assigned by Dr. Saint-Preux (R. at 24-25), even "reiterat[ing]" that "the GAF scores he repeatedly assigned to the claimant[] are not consistent with the severe limitations both he and Dr. Lubrano opined the claimant to have" (R. at 25; see also R. at 23).   The Second Circuit has recently noted that "several courts, both before and after the removal of the GAF metric" from DSM-5, have questioned "whether a GAF generally provides a reliable basis for disability determinations." Rock v. Colvin, 628 F. App'x 1, 4 n.3 (2d Cir. 2015).   It is clear, however, that "a claimant's GAF score is insufficient evidence to invalidate a treating physician's other clinical findings." Estela-Rivera v. Colvin, No. 13 CV 5060, 2015 WL 5008250, at *15 (E.D.N.Y. Aug. 20, 2015). Here, the ALJ appears to have relied primarily on the GAF score to discount Mr. Madera's treating psychiatrists' other opinions about his residual functional capacity.   This was error.   Indeed, to the extent that there was an inconsistency between the GAF score assigned by Dr. Saint-Preux and other evidence in the record, such as the opinions by Dr. Lubrano and Dr. Saint-Preux that Mr. Madera was markedly limited in a number of areas of functioning, the ALJ was required to "seek clarification and additional information . . . before rejecting the [doctors'] opinion[s]." Stroud v.

35

Commissioner of Social Security, No. 13 Civ. 3251, 2014 WL 4652581, at *10 (S.D.N.Y. Sept. 8, 2014) (quoting Ureña-Perez v. Astrue, No. 06 Civ. 2589, 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009)); see also Credle v. Astrue, No. 10 CV 5624, 2012 WL 4174889, at *20 (E.D.N.Y. Sept. 19, 2012) ("When 'an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly' . . . ." (quoting Lazo-Espinoza v. Astrue, No. 10-CV-2089, 2012 WL 1031417, at *13 (E.D.N.Y. March 27, 2012))).[11]

> ## 2.   Dr. Dudley

Similarly, ALJ Grossman rejected Dr. Dudley's opinion without demonstrating that he took into account the relevant factors, again focusing only on a supposed inconsistency between Dr. Dudley's assessment of Mr. Madera's limitations and other medical evidence, (R. at 25-26). A fuller discussion of the reasons for discounting the treating physician's opinion is particularly necessary here, where Dr. Dudley's opinion was discounted in favor of the opinion of Dr. Galst, the medical expert who testified at the hearing but who never examined Mr. Madera. (R. at 26); see, e.g., Seekins v.

---

[11] ALJ Grossman's statement that he rejected the treating psychiatrists' opinions in favor of that of state agency psychological consultant Dr. Kamin because "Dr. Kamin's opinion is essentially identical" to ALJ Grossman's own (R. at 24) comes close

<u>Astrue</u>, No. 3:11-cv-264, 2012 WL 4417264, at *4 (D. Conn. Sept. 27, 2012) ("[T]he opinions of a non-examining physician do not constitute substantial evidence when standing alone."). On remand, the ALJ should carefully provide "good reasons" if he is to fail to give Dr. Dudley's opinion controlling weight.

<u>Conclusion</u>

For the reasons set forth above, I recommend that the defendant's motion be denied, the Commissioner's decision be vacated, and the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley, Room 1920, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

---

to suggesting that the ALJ "substitute[d] his own judgment for competent medical opinion." <u>Rosa</u>, 168 F.3d at 79.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           May 9, 2016


Copies transmitted this date to:

Eli S. Madera
2635 Sedgwick Ave.
Apt. 3-B
Bronx, NY 10468-3829
(via U.S. Mail)

Brandon M. Waterman, Esq.
Assistant U.S. Attorney
86 Chambers St.
New York, NY 10007
(via ECF)